**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0222-20

IVAN TYMIV and
OKSANA TYMIV,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

LOWE'S HOME CENTERS, LLC,[1]

      Defendant-Respondent/
      Cross-Appellant,

and

AHMED HASSAN,

      Defendant-Respondent.

_____

      Submitted May 18, 2021 – Decided July 30, 2021

      Before Judges Fisher and Gummer.

---

[1] Plaintiff referred to this defendant as "Lowes Home Centers, LLC" in the caption of the complaint. We utilize "Lowe's Home Centers, LLC" in the caption because defendant used that name in its court submissions.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-6536-17.

Richard A. Vrhovc, attorney for appellants/cross-respondents.

Goldberg Segalla LLP, attorneys for respondent/cross-appellant (Thomas M. Crino, Thaddeus J. Hubert, IV, H. Lockwood Miller, III, and Sara L. Sapia, on the briefs).

Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys for respondent (Jeffrey J. Czuba, of counsel and on the brief).

PER CURIAM

In this case involving a physical altercation between a customer and an employee of defendant Lowe's Home Centers, LLC, plaintiffs appeal orders that: granted summary judgment in favor of Lowe's; granted partial summary judgment on negligence claims in favor of the Lowe's employee, defendant Ahmed Hassan; precluded portions of testimony of plaintiffs' vocational and economic experts; and permitted testimony of Lowe's' biomechanical-engineering expert. Lowe's cross-appeals the court's denial of its motion to bar plaintiffs' retail-industry expert and decision to preclude police officers' lay opinions about how the altercation occurred. Because the motion judges erred in granting the summary-judgment motions and in precluding in part testimony from plaintiffs' vocational and economic experts, we reverse those orders.

2

Because the motion judges did not err in permitting the testimony of plaintiffs' retail-industry expert and Lowe's' biomechanical-engineering expert, in barring opinion testimony of responding police officers, and in denying related reconsideration motions, we affirm those orders.

I.

Lowe's hired Hassan as a flooring customer sales associate on May 4, 2017. Hassan previously had been employed by Lowe's as a cashier in the summers of 2013 and 2015. He had no prior experience as a customer sales associate or in the flooring department. A customer sales associate is responsible for "[p]rovid[ing] superior customer service by assisting customers in selection, demonstration, and purchase of product[s] . . . [and] provid[ing] quick responsive customer service." A customer sales associate's "essential knowledge" and "skills" include "[u]nderstand[ing] and respond[ing] appropriately to basic customer . . . inquiries" and being able "to operate/demonstrate/explain merchandise in the assigned area." A customer sales associate is required to wear a clean uniform and a name tag.[2]

---

[2] According to an assistant manager at the store where Hassan was employed, new employees in training have a "training tag" on them so a customer can see the tag "and understand that, if they're not a subject matter expert, be a little bit more patient with them, where they might reach out to another associate for

A-0222-20

According to plaintiffs' retail-industry expert, at the time of the parties' altercation, Hassan had not yet completed all of his training, including a computerized training module entitled "Impacting the Customer." That training module contained twenty-eight separate videos explaining how to interact with customers to create a "positive customer experience" and included one skit with instructions on how to interact with an upset customer and multiple videos with instructions on how to react to a customer who approaches and says, "You people must not know what you're doing . . . ." Hassan also had not received training on Lowe's written Workplace Violence Procedure, which defined workplace violence as including "aggressive contact directed toward another individual" and stated "[a]ny employee who commits workplace violence will be subject to disciplinary action up to and including termination." For their first seven to fourteen days, new employees are paired with a mentor, who is an associate in the store with a working knowledge of different areas of the store. According to a Lowe's training video, a new employee will receive training time to shadow more experienced employees before working by themselves and must

_____

assistance." A picture taken from a video recorded by a responding police officer's body camera shows Hassan was wearing a name tag at hip level. A photograph of the name tag showed it did not indicate Hassan was in training.

4

earn a red vest before working alone and before helping customers.[3] Even though he was a new employee who had not completed his training and had not yet earned the red vest, Hassan was the only person assigned to work in the flooring department at the time of the altercation.

On May 13, 2017, nine days after Lowe's had hired Hassan as a customer sales associate, plaintiff Ivan Tymiv, who worked in the construction field,[4] went to Lowe's with a client to purchase supplies, including grout, for a home-remodeling project. According to plaintiff, he entered an aisle, which contained grout, and saw his client talking to Hassan. Plaintiff overheard Hassan give the client inaccurate information about grout. Plaintiff wanted unsanded grout and asked Hassan which grout was unsanded. Hassan told him he did not need unsanded grout for the type of tile he would be using. Plaintiff disagreed with Hassan's advice and told him if he did not know what he was talking about, he

---

[3] According to plaintiffs' retail-industry expert, these procedures – being paired with a more experienced co-worker, having an experienced co-worker assigned to the department where the new employee is working, and not permitting a new employee to work alone in a department until after completing a training period – are consistent with accepted and standard practices in the retail industry.

[4] Plaintiff testified he was self-employed with another partner in a business. That business was called Eagle Team NYC, LLC, which, according to plaintiffs' economic expert, was a partnership formed by plaintiff's wife Oksana Tymiv and someone else in March 2017.

should not say anything but should "[j]ust learn [a] little more about it, and then tell [it] to the customers." Hassan became angry, screamed and cursed at plaintiff and the client, and said he had a Ph.D. in history and did not have to learn about "this shit." Hassan turned around and walked away.

While holding a bag of grout, plaintiff and the client followed Hassan to the next aisle and repeatedly asked for his name. Hassan turned around, walked towards plaintiff, asked plaintiff what he was going to do, and hit the bottom of the grout bag with his hand, knocking it out of plaintiff's hand and into the air and causing it to burst open. Hassan also punched plaintiff in the face with his hand and a broom he was carrying and then ran away. Plaintiff told another employee he had been struck by an employee and told her he wanted to speak to a manager and the police. The police came but accused plaintiff of assaulting Hassan, asking him why Hassan had grout on his head and back. Plaintiff left the store in an ambulance and went to a hospital. He asserts he is totally disabled as a result of the injuries he sustained in the altercation.

Hassan has a different recollection of the altercation. According to Hassan, he approached plaintiff and the client and asked if he could be of any

6

assistance.[5]   Plaintiff asked him about the difference between sanded and unsanded grout.   After Hassan stated his understanding of the difference, plaintiff told him he should learn more.  Hassan explained to him he was still in training and his knowledge was "very limited."  Plaintiff questioned how Hassan could be working on the floor if he did not know the difference between sanded and unsanded grout.  Hassan described plaintiff as going "immediately from zero to 100 angry."  Believing the situation was becoming confrontational, Hassan walked away.  Plaintiff followed him, yelling at him and demanding his name; Hassan was in fear for his life.  He felt something hit the back of his neck, head, and shoulder.  Hassan glanced back, saw "white stuff" on his shoulder and saw plaintiff with a clenched fist about to punch him.  Hassan attempted to use a "sweeper" to block the punch, hitting plaintiff in the face with it.  Hassan described his actions as a "defensive measure."  As plaintiff continued to follow him, Hassan found a co-worker, told her he had been assaulted, asked her to call

---

[5]  Contrary to the Lowe's training video stating a new employee in training must earn the red vest before helping customers, Lowe's' regional human resources manager for the store where Hassan was employed testified all customer service associates, even those still in training, are encouraged to approach customers "to give them service and to help them."  The store manager also testified an employee in training could approach a customer before earning a red vest.

security and the police, and went to a break room. After leaving the store that day, Hassan never returned and was fired for job abandonment.

## II.

Plaintiff and his wife Oksana Tymiv filed a complaint against Lowe's and Hassan and subsequently amended the complaint. Plaintiffs alleged Lowe's negligently supervised and trained defendant Hassan.[6] In a subsequent letter, plaintiffs' counsel advised defense counsel plaintiffs were amending their interrogatory answers to state "Hassan was acting within the scope of his employment at the time of the incident and therefore . . . Lowes is vicariously liable under the doctrine of respondeat superior." In addition to asserting generally Hassan was negligent, plaintiffs alleged in the amended complaint Hassan's conduct constituted the "intentional and offensive tort of battery."

During the course of discovery, Lowe's produced a report prepared by a purported biomechanical-engineering expert, Jacob L. Fisher, who opined the "grout bag was not launched into the air by a single blow from [Hassan], rather it was thrown . . . on a trajectory that roughly paralleled the path taken by

---

[6] We take that summary of plaintiffs' allegations from plaintiffs' appellate brief. To the extent plaintiffs' amended complaint could be interpreted as containing other allegations concerning Lowe's, we do not address them because plaintiffs did not address them. See N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015).

8

[Hassan] along the aisle." Given his findings regarding the trajectory of the grout bag, he concluded plaintiff's account of the altercation to be "inconsistent with the physical evidence gathered and recorded" while Hassan's account was "largely consistent" with the evidence.

Plaintiffs produced a report from a "retail industry consultant," Alex J. Balian, who opined Lowe's had failed to follow its own employee-training procedure or the industry standard for training and had been negligent in its supervision of Hassan. Plaintiffs also produced a report from a vocational expert, Edmond Provder, who opined because of the injuries plaintiff had sustained in the altercation, plaintiff is unable to continue his work as a construction supervisor, in which he could earn annually $75,000. Provder estimated plaintiff had sustained a total loss of $2,340,000 in earning capacity. Plaintiffs also produced a report from economist Kristin Kucsma, who evaluated "the economic losses" to plaintiff as a result of his alleged injury and concluded the "total present value of past and future pecuniary losses" resulting from his alleged injury was $3,418,466.

After discovery closed, the parties moved in limine to exclude each other's experts' testimony and plaintiffs moved to bar opinion and other testimony from the police officers who responded to the subject incident.

9

The motion judge denied Lowe's' motion to bar the testimony of plaintiffs' retail-industry expert, finding Balian to be qualified to render the opinion "because of his hands-on experience in training managers and employees in retail stores" and "vast exposure to training manuals and operating procedures of retail stores throughout the country." The judge also found Balian's opinion was based on "generally-accepted standards in the industry and is not a net opinion" and that "[t]he standard of care required for training and supervising employees in the retail industry is not something which the average juror would be able to determine." The motion judge subsequently denied Lowe's' motion for reconsideration of the denial of this motion.

The motion judge denied plaintiffs' motion to bar the testimony of Lowe's' biomechanical expert, finding his expertise was "outside the ken of the average juror and [his opinion] is not a net opinion."

The motion judge granted plaintiffs' motion to bar the testimony of the police officers, precluding them from testifying about "their opinions of how the incident occurred" but permitting them to testify about "any factual issues that they observed, including plaintiff's demeanor, [being] evasive with answers, defensive, arrogant, and the like." Denying Lowe's' subsequent motion for reconsideration of that decision, the motion judge again held the police officers

could testify about their personal observations, such as where the grout was located, but could not testify as to "their opinion about who with what."

Lowe's moved for summary judgment, arguing plaintiffs could not establish Lowe's was negligent in hiring, training, or supervising Hassan because plaintiffs failed to establish Lowe's had breached any standard of care and Lowe's could not be held vicariously liable for Hassan's alleged battery because his actions were not within the scope of his employment.

The motion judge granted Lowe's' summary-judgment motion, dismissing with prejudice plaintiffs' complaint against Lowe's. Viewing the case as "an assault," the judge held plaintiff had failed to prove "proximate cause between the lack of training of defendant Hassan, red vest status, lack of name tag, or shadowing polices and the assault of plaintiff by defendant Hassan." In addition, the motion judge found Lowe's could not be held vicariously liable because "there are no facts that a rational fact finder could construe that . . . Hassan . . . assaulted plaintiff [in] an effort to serve the employer, Lowe's." The motion judge also found Lowe's could not be held responsible because Hassan's actions were "clearly inappropriate or unforeseeable" and "totally unexpected." The judge concluded Lowe's' "training or lack of is simply not applicable to this case."

11

Lowe's moved to bar the testimony of plaintiffs' vocational and economic experts. Hassan joined in that motion. A different motion judge granted in part and denied in part that motion. The motion judge held the experts could testify about "life plans" given the "underlying medical testimony." "[W]ith respect to the future economic loss," he held plaintiffs could not "use or rely on testimony [about] a $75,000 annual salary" calculation. The judge found both "experts have offered a net opinion about loss wages. There is no evidence in the record that this – salary has ever been [earned] – by the plaintiff." The judge held:

> The expert, as far as it can be determined, – selected an employment – through the Department of Labor statistics, opined that the plaintiff was qualified for that position and that the average salary that was listed on that table should be the foundation for which economic calculations should be based. There is not enough factual material . . . that would support that figure as being the equivalent of a lodestar for calculating economic loss.

The motion judge also rejected plaintiffs' attempt to prorate plaintiff's income from certain months to calculate economic loss. The judge found:

> Again because of the nature . . . of his business, . . . to rely on the proposed number . . . projections of a newly formed, self-owned business are not truly factual. Such a business is subject to the uncertainties in changing economic conditions. The sample size is too small to extrapolate . . . $91,000 a year--; especially since no further evidence has been provided regarding costs and expenses of the ongoing business. . . . [I]t may not be

12

> relied upon by the plaintiff . . . and cannot be introduced.

The motion judge concluded plaintiffs' experts could "talk about life plans, but they cannot talk about $75,000 or $91,000 as in the baseline for plaintiff's economic loss as that is speculative." In a written order the motion judge directed that Provder and Kucsma were "permitted to testify about the life plan" but were "barred from testifying or using $75,000 or $91,000 as the measurement of wage loss to calculate future losses" because those figures were "not based on [p]laintiff's prior employment history."

Hassan moved for partial summary judgment on plaintiffs' negligence claims against him, arguing plaintiffs had not plead sufficient facts to support a negligence claim given that they alleged only that Hassan acted with the intent to cause plaintiff harm by striking him. In opposition, plaintiffs argued "a jury could find that [Hassan] was guilty of both negligen[ce] and acting intentionally."

The judge who had decided the motion regarding plaintiffs' vocational and economic experts granted Hassan's motion for partial summary judgment and dismissed all negligence claims against Hassan with prejudice. The motion judge found "plaintiff has failed to establish any duty or obligation [d]efendant Hassan had to protect plaintiff from injury or breach there[from]." The judge

13

held "[w]ithin the context of customer/employee relations, there is no such obligation imposed on an employee not to commit assaults on customers." Therefore, the motion judge found "no genuine issue of material fact that Hassan's conduct constitute[d] negligence." Plaintiffs and Hassan subsequently agreed to dismiss with prejudice the remaining claims against Hassan.

III.

In this appeal, plaintiffs argue the motion judge erred in granting Lowe's' summary-judgment motion, noting the motion judge did not address plaintiffs' allegations of negligent supervision and contending a sufficient causal nexus existed between Lowe's' alleged negligent training and supervision of Hassan and Hassan's altercation with plaintiff and that Hassan was acting within the scope of his employment at the time of the altercation.[7] Plaintiffs also appeal the order granting Hassan's motion for partial summary judgment, arguing the physical confrontation at issue demonstrates a failure by Hassan to exercise

---

[7] Plaintiffs argue for the first time on appeal that California's enterprise liability standard of respondeat superior should be adopted and applied to this case. We do not reach that argument given that we for other reasons reverse the order granting Lowe's' summary-judgment motion and because plaintiffs did not raise it in the trial court. See N.J. Div. of Youth and Fam. Servs. v. M.C. III, 201 N.J. 328, 339 (2010) (finding that "issues not raised below will ordinarily not be considered on appeal unless they are jurisdictional in nature or substantially implicate the public interest").

reasonable care, Hassan had a duty not to commit an intentional tort, and, given the disputed facts, a juror could conclude Hassan's negligence caused plaintiff's injuries. Plaintiffs appeal the order denying plaintiffs' motion to bar the testimony of Lowe's' biomechanical-engineering expert, arguing the expert's opinions were inconsistent with physical evidence, flawed because the expert had not conducted recreation experiments and had not interviewed witnesses, were net opinions, were not beyond the ken of an average juror, mischaracterized testimony, or were otherwise inaccurate. Finally, plaintiffs appeal the order precluding evidence regarding plaintiff's lost earning capacity, arguing plaintiffs' vocational and economic experts' opinions were supported by plaintiff's work and earning history.

In response, Lowe's argues the motion judge correctly granted its summary-judgment motion because Hassan was not acting within the scope of his employment when he assaulted plaintiff and, thus, Lowe's could not be held vicariously liable for his actions; and plaintiffs failed to establish Lowe's was negligent in training or supervising Hassan or that any such negligence proximately caused the altercation. Lowe's contends the motion judge correctly denied plaintiffs' motion to bar testimony from Lowe's' biomechanical-engineering expert, asserting the expert was qualified and that his opinion had a

15

sufficient factual basis and would be helpful to a jury. Lowe's argues the motion judge did not err in precluding plaintiffs' vocational and economic experts from testifying about plaintiff's lost earning capacity because their opinions were speculative and not based on the evidence.

Lowe's cross-appeals the orders denying Lowe's' motion to bar the testimony of plaintiffs' retail-industry expert, granting plaintiffs' motion to exclude opinion testimony from the responding police officers, and denying Lowe's' related reconsideration motions. Lowe's argues the motion judge erred in not barring the retail-industry expert's testimony because his opinion was a net opinion, he improperly relied on Lowe's' internal policies, and the subject of his opinion was not beyond the ken of an average juror. Lowe's argues the motion judge erred in barring the police officer's opinion testimony about how the incident occurred because their opinions are based on their perceptions and observations pursuant to N.J.R.E. 701.

Responding to plaintiffs' appeal of the order granting his motion for partial summary judgment, Hassan argues the motion judge correctly determined the facts cannot support a claim of negligence against Hassan.

## A.

We review a grant of summary judgment using the same standard that governs the trial court's decision. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018). Under that standard, summary judgment will be granted when "the competent evidential materials submitted by the parties," viewed in the light most favorable to the non-moving party, show there are no "genuine issues of material fact" and that "the moving party is entitled to summary judgment as a matter of law." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014); see also Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017); R. 4:46-2(c).

"An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande, 230 N.J. at 24 (quoting Bhagat, 217 N.J. at 38). We owe no special deference to the trial court's legal analysis. RSI Bank, 234 N.J. at 472.

### 1.

"The fundamental elements of a negligence claim are a duty of care owed by defendant to the plaintiff, a breach of that duty by the defendant, injury to

the plaintiff proximately caused by the breach, and damages."  Robinson v. Vivirito, 217 N.J. 199, 208 (2014).

Proximate cause is "a basic element of tort law" that "defies precise definition."  Cruz-Mendez v. ISU/Ins. Servs. of S.F., 156 N.J. 556, 575 (1999); see also New Gold Equities Corp. v. Jaffe Spindler Co., 453 N.J. Super. 358, 379 (App. Div. 2018).  Courts have recognized "but for" and "substantial factor" forms of causation.  Komlodi v. Picciano, 217 N.J. 387, 422 (2014); see also Conklin v. Hannoch Weisman, P.C., 145 N.J. 395, 417 (1996); Vuocolo v. Diamond Shamrock Chems. Co., 240 N.J. Super. 289, 294-95 (App. Div. 1990). "But for" causation applies in cases involving "only one potential cause of the injury or harm."  Ibid.; see also Evers v. Dollinger, 95 N.J. 399, 415 (1984) (finding in "the more routine tort case . . . the law requires proof that the result complained of probably would not have occurred 'but for' the negligent conduct of the defendant").  "Substantial factor" causation applies "when there are concurrent causes potentially capable of producing the harm or injury."  Ibid.; see also Brown v. U.S. Stove Co., 98 N.J. 155, 171 (1984) (finding "a tortfeasor will be held answerable if its 'negligent conduct was a substantial factor in bringing about the injuries,' even where there are 'other intervening causes which were foreseeable or were normal incidents of the risk created'") (quoting

Rappaport v. Nichols, 31 N.J. 188, 203 (1959)). "A substantial factor is one that is 'not a remote, trivial or inconsequential cause.'" Id. at 423 (quoting Model Jury Charge (Civil), 6.13, "Proximate Cause – Where There is a Claim that Concurrent Causes Harm are Present and Claim that Specific Harm was not Foreseeable" (approved May 1998)).

Negligent supervision and training "are not forms of vicarious liability and are based on the direct fault of an employer." G.A.-H. v. K.G.G., 238 N.J. 401, 415 (2019). To prove negligent supervision or training, a plaintiff "must prove that (1) an employer knew or had reason to know that the failure to supervise or train an employee in a certain way would create a risk of harm and (2) that risk of harm materializes and causes the plaintiff's damages." Id. at 416.

The motion judge granted Lowe's' summary judgment on plaintiffs' direct negligence claims against Lowe's because he determined "proximate cause does not exist." He made that determination even though "[g]enerally, the determination of proximate cause is an issue of fact for the [factfinder]." Cruz-Mendez, 156 N.J. at 576. "Only in the rare case in which 'it appears to the court highly extraordinary that [the actor's conduct] should have brought about the harm,' will courts remove the issue of proximate cause from the jury." Ibid. (quoting Caputzal v. Lindsay Co., 48 N.J. 69, 78 (1966)); see also Broach-Butts

A-0222-20

v. Therapeutic Alts., Inc., 456 N.J. Super. 25, 41 (App. Div. 2018) (requiring court to apply the highly-extraordinary standard when determining the actor's conduct was not the legal cause of another's harm).

The motion judge erred in granting summary judgment as to plaintiffs' direct negligence claims against Lowe's on the basis of his determination that "proximate cause does not exist." Even if the judge had applied the highly-extraordinary standard in determining as a matter of law that "proximate cause does not exist" – and he didn't – the record evidence would support sending the question of proximate cause to the jury. Viewing the facts in a light most favorable to plaintiffs, a reasonable factfinder could conclude Lowe's knew of the importance of training new customer service associates to interact with customers, including unhappy customers questioning whether the customer service associate knew what he was doing, to ensure a "positive customer experience" and of pairing a new customer service associate with an experienced associate while still in training. Yet, despite that and contrary to industry standards, Lowe's assigned Hassan to work alone and unsupervised in the department before he had completed his training. It was for the jury, not the judge, to determine whether Lowe's failed to train and supervise Hassan

properly, and, if so, whether that failure was a substantial factor in causing the harm at issue in this case.

2.

The motion judge also erred in granting summary judgment on plaintiffs' vicarious-liability claim. "The imposition of vicarious liability upon employers for the acts of an employee, also known as the doctrine of respondeat superior, is based upon the idea that the employee is the agent . . . of the employer." G.A.-H., 238 N.J. at 415. "Under respondeat superior, an employer can be found liable for the negligence of an employee causing injuries to third parties, if, at the time of the occurrence, the employee was acting within the scope of his or her employment." Carter v. Reynolds, 175 N.J. 402, 408-09 (2003).

Courts have considered four factors in determining whether an employee's action is within the scope of employment. Davis v. Devereux Found., 209 N.J. 269, 303 (2012). An employee's action is within the scope of employment if: (1) "it is of the kind he is employed to perform"; (2) "it occurs substantially within the authorized time and space limits"; (3) "it is actuated, at least in part, by a purpose to serve the [employer]"; and (4) "if force is intentionally used by the [employee] against another, the use of the force is not unexpected by the

[employer]." Ibid. (quoting Restatement (Second) of Agency § 228 (Am. Law Inst. 1958)).

"The question of whether an individual acted within or outside the scope of employment often arises in the context of intentional wrongful acts of the individual employee that the corporation disavows in order to avoid respondeat superior liability." Vosough v. Kierce, 437 N.J. Super. 218, 235 (App. Div. 2014). An employee's intentional or reckless action may be considered within the scope of employment. Id. at 235-36. As our Supreme Court recognized in Davis, "[w]hen the employee's conduct – however aggressive and misguided – originated in [an] effort to fulfill an assigned task, the act has been held to be within the scope of employment." 209 N.J. at 303; see also, e.g., Gibson v. Kennedy, 23 N.J. 150, 154-57 (1957) (holding evidence supported finding that train conductor, who had testified he was acting in self-defense, was acting within the scope of his employment when he struck a passenger); Mason v. Sportsman's Pub, 305 N.J. Super. 482, 489-500 (App. Div. 1997) (tavern's bouncer, who testified patron had hit and threatened him, was acting within scope of employment when he injured patron); Schisano v. Brickseal Refractory Co., 62 N.J. Super. 269, 275-76 (App. Div. 1960) (holding employee could have been acting within the scope of his employment when he hit the plaintiff). "The

fact that the employee's conduct is intentional and wrongful does not in itself take it outside the scope of his employment." Vosough, 437 N.J. Super. at 236.

When an employee's assigned duties "place the employee in situations in which physical consequences may follow in an uninterrupted sequence from verbal exchanges with third parties[,] . . . [i]t is a question of fact what motivated an employee's conduct as verbal exchanges escalate or when an employee's use of physical force becomes more pronounced." Restatement (Third) of Agency § 7.07 cmt. c (Am. Law Inst. 2006). "An escalation in the pitch of an employee's conduct does not by itself transform the conduct into an independent course of conduct that represents a departure not within the scope of employment." Ibid.

When an employee's actions are "so far removed from the scope of his duties," the employee is not considered to be acting within his scope of employment. Vosough, 437 N.J. Super. at 236; see also, e.g., Davis, 209 N.J. at 306-07 (finding counselor's premeditated act of throwing burning water onto a patient was not within scope of employment).

Hassan's actions are not "so far removed from the scope of his duties" that the motion judge could decide the issue of vicarious liability in a summary-judgment motion. Unlike Davis, this case did not involve an employee's

23

premeditated attack. Under either plaintiff's or Hassan's factual scenario, the altercation began with an employee performing his job in his assigned department by interacting with and providing information to a customer, the employee and customer engaged in a verbal exchange, and that verbal exchange escalated to a physical altercation. Whether that escalation transformed Hassan's actions into "an independent course of conduct" outside the scope of his employment, see Restatement (Third) of Agency § 7.07 cmt. c, or whether his actions were unexpectable by Lowe's under the circumstances, Davis, 209 N.J. at 303, was for a jury to decide.

3.

The motion judge erred in granting Hassan's motion for partial summary judgment. In Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520 (1995), our Supreme Court summarized the "essence" of a court's "inquiry" in deciding a summary-judgment motion: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 536 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)); see also Vizzoni v. B.M.D., 459 N.J. Super. 554, 567 (App. Div. 2019).

Here, the evidence is not so one-sided that Hassan is entitled to prevail as a matter of law. Genuine issues of material fact clearly exist based on plaintiff's and Hassan's differing views of the altercation and what led to the altercation. The record contains sufficient evidence to support a jury finding that Hassan intentionally assaulted plaintiff. The record also contains sufficient evidence – including Hassan's own testimony – to support a jury finding that Hassan acted negligently in inadvertently striking plaintiff while attempting to block plaintiff's punch. Accordingly, whether Hassan's actions constitute negligence or an intentional act should be decided by a jury, and not a judge in a summary-judgment motion.[8]

## B.

A trial court's decision concerning the admission of expert testimony into evidence is entitled to our deference and is reviewed under an abuse-of-discretion standard. Townsend v. Pierre, 221 N.J. 36, 52 (2015). An abuse of discretion occurs when a judge's decision "was not premised upon consideration

---

[8] The motion judge stated in his decision: "[w]ithin the context of customer/employee relations, there is no such obligation imposed on an employee not to commit assaults on customers." It would seem self-evident that at a minimum a store employee has an obligation not to assault the store's customers. Even if it wasn't self-evident, Lowe's' Workplace Violence Procedure makes it clear that assaulting a customer could result in termination.

of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005); see also State v. S.N., 231 N.J. 497, 515 (2018).

N.J.R.E. 702 and 703 frame the analysis for expert-testimony admissibility. Townsend, 221 N.J. at 53. N.J.R.E. 702 imposes three basic requirements:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Landrigan v. Celotex Corp., 127 N.J. 404, 413 (1992).]

See also Townsend, 221 N.J. at 53. Those requirements "are construed liberally in light of Rule 702's tilt in favor of the admissibility of expert testimony." State v. Jenewicz, 193 N.J. 440, 454 (2008).

Pursuant to N.J.R.E. 703, an expert opinion must be based on "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject." State v. Townsend, 186 N.J.

473, 494 (2006) (quoting Richard Biunno, New Jersey Rules of Evidence 896 (2005)); see also Townsend, 221 N.J. at 53.

Rule 703's corollary, the net opinion rule, "stands for the proposition that an expert opinion must have a rational basis" and prohibits admitting an expert's opinion into evidence if its conclusions are not supported by factual evidence or data. Crispino v. Twp. of Sparta, 243 N.J. 234, 257 (2020). "[T]he net opinion rule requires an expert witness to give the why and wherefore of his expert opinion, not just a mere conclusion." Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996); see also Crispino, 243 N.J. at 257. "[B]are conclusions, unsupported by factual evidence, [are] inadmissible." Buckelew v. Grossbard, 87 N.J. 512, 524 (1981); see also Fin. Servs. Vehicle Tr. v. Panter, 458 N.J. Super. 244, 257 (App. Div. 2019).

The net opinion rule does not impose a "standard of perfection." Townsend, 221 N.J. at 54. Rather, it "is a prohibition against speculative testimony." Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997). A judge should not admit expert testimony "if it appears the witness is not in possession of such facts as will enable him to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture." Vuocolo, 240 N.J. Super. 289, 299 (App. Div. 1990). However, an expert's testimony should

27

not be excluded simply "because it fails to account for some particular condition or fact which the adversary considers relevant." State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1988). The net opinion rule does not "mandate that an expert organize or support an opinion in a particular manner that opposing counsel deems preferable." Townsend, 221 N.J. at 54. That an expert declines "to give weight to a factor thought important by an adverse party does not reduce [the expert's] testimony to an inadmissible net opinion if [the expert] otherwise offers sufficient reasons which logically support his opinion." Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002). Instead, the purported deficiencies in the expert's opinion may be "a proper 'subject of exploration and cross-examination at a trial.'" Ibid. (quoting Rubanick v. Witco Chem. Corp., 242 N.J. Super. 36, 55 (App. Div. 1990), modified on other grounds, 125 N.J. 421 (1991)).

Under that legal framework, we see no abuse of discretion in the motion judge's denial of plaintiffs' motion to exclude the testimony of Lowe's' biomechanical expert. Dr. Fisher opined about the trajectory of the grout bag and dispersion of grout and set forth the factual bases for his opinions. As the motion judge correctly held, Dr. Fisher's expertise was "outside the ken of the average juror and [his opinion] is not a net opinion." Plaintiffs' arguments

regarding purported errors in Dr. Fisher's report and criticisms about what Dr. Fisher should have done provide the bases for cross-examination, not the exclusion of Dr. Fisher's testimony. As for Dr. Fisher's comments regarding whether plaintiff's or Hassan's testimony is consistent with his conclusions regarding the physical evidence, we are confident the trial judge and trial counsel will be mindful of the long-standing rule that experts may not opine about the credibility of witnesses. See State v. J.R., 227 N.J. 393, 411 (2017); State v. McLean, 205 N.J. 438, 453 (2011).

The motion judge abused his discretion in barring plaintiffs' vocational and economic experts from "testifying or using $75,000 or $91,000 as the measurement of wage loss to calculate future losses."

In a personal-injury case, an "injured party has the right to be compensated for diminished earning capacity." Caldwell v. Haynes, 136 N.J. 422, 433 (1994); see also Donelson v. DuPont Chambers Works, 206 N.J. 243, 258 (2011). Diminished-earning-capacity damages are based on the plaintiff's lost wages and "include[] the value of the decrease in the plaintiff's future earning capacity." Ibid. The plaintiff must present sufficient factual evidence from "which the

quantum of diminishment can reasonably be determined."  Coll v. Sherry, 29 N.J. 166, 176 (1959).[9]

The vocational expert set forth the factual basis for using $75,000 as the measurement of wage loss to calculate future losses:  plaintiff was a "construction supervisor" for the last two businesses for which he had worked or owned and $75,000 is the average earnings of construction supervisors in plaintiff's county.  The economist used $75,000 based on the vocational expert's finding.  The experts, thus, set forth the "why and wherefore" of their opinions, Jimenez, 286 N.J. Super. at 540, and the motion judge erred in striking their testimony as net opinions.  Defendant is free at trial to challenge the experts' opinions, arguing, as it does in this appeal, that plaintiff never actually earned that amount and likely would not earn that amount.  But, again, that is the basis for cross-examination, not a finding of a net opinion.[10]

---

[9]  Because the "proper measure of damages for lost income in personal-injury cases is net income after taxes," Ruff v. Weintraub, 105 N.J. 233, 238 (1987), parties may present evidence regarding what a plaintiff's net income was or would be, including evidence of a plaintiff's income-tax obligation. Caldwell, 136 N.J. at 434-36.

[10]  The parties' dispute about the $91,000 figure apparently is not based on any finding or opinion of plaintiffs' experts, but on plaintiff's testimony concerning his earnings.  Again, defendant is free at trial on cross-examination to challenge the credibility of that testimony.  The motion judge's reliance on Bell Atlantic

The motion judge did not abuse his discretion in denying Lowe's' motion to bar the testimony of plaintiffs' retail-industry expert. Balian explained the factual bases of his opinions, and, as the motion judge correctly found, Balian demonstrated sufficient experience in the retail industry to qualify as an expert in the field, he stated his opinions were based on industry standards and practices, and the standard of care required for training and supervising retail-industry employees is beyond the ken of an average juror. On cross-examination, defendant may challenge Balian's understanding of industry standards or its training materials, but, again, that is not a basis to exclude his testimony.

Finally, the motion judge did not abuse his discretion in barring the responding police officers from testifying about "their opinions of how the incident occurred." The judge did not by rote bar their testimony but expressly held the officers could testify about "any factual issues that they observed, including plaintiff's demeanor, [being] evasive with answers, defensive, arrogant, and the like." His ruling is appropriate under the circumstances and

Network Services, Inc. v. P.M. Video Corp., 322 N.J. Super. 74, 101 (App. Div. 1999), a business dispute with "enormous complexity of the multiple business relationships" and "new, highly innovative products whose reception by the public was doubtful," was misplaced.

consistent with the law. See McLean, 205 N.J. at 460; Gonzales v. Hugelmeyer, 441 N.J. Super. 451, 460 (App. Div. 2015). The police officers did not witness the altercation between plaintiff and Hassan. To allow them to opine as to how the altercation occurred would be a clear invasion of the jury's factfinding-province.

IV.

In sum, we reverse the orders granting Lowe's summary-judgment motion and Hassan's motion for partial summary judgment and the order precluding in part testimony from plaintiffs' vocational and economic experts. We otherwise affirm.

Affirmed in part; reversed in part and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0222-20